UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JENNIFER GUEBER,                 ) | |
| ) | |
| Plaintiff,            ) | |
| ) | |
| v.                                              ) | No. 1:17 CV 439 |
| ) | |
| COMMUNITY HEALTH SYSTEMS  ) | |
| d/b/a KOSCIUSKO AMBULANCE  ) | |
| SERVICES, LLC d/b/a/ LUTHERAN  ) | |
| EMS - FULTON,                      ) | |
| ) | |
| Defendant.         ) | |

**OPINION and ORDER**

This matter is before the court on defendant's motion for summary judgment. (DE # 44.) For the reasons identified below, the motion will be granted in part and denied in part.

**I.      BACKGROUND**

*A.      Factual Background*

Plaintiff Jennifer Gueber began working as a part-time paramedic for Fulton County, Indiana in 2014. (DE # 46-4 at 25-27.) In 2016, Fulton County contracted with defendant Kosciusko Ambulance Services, LLC, to privatize the county's ambulance service. (DE # 46-4 at 35; DE # 46-5 at 32-34.) As a result, plaintiff became a full-time employee of defendant. (DE # 46-4 at 42.)

Jen Galloway was plaintiff's direct supervisor from January 2016 until October 2017, when Scott Sigerfoos became plaintiff's supervisor. (DE # 46-4 at 27, 50-51; DE # 46-7 at 4.) In 2016 and 2017, Pat Unger, Executive Director for defendant, supervised

Galloway, and subsequently Sigerfoos, in their capacities as managers. (DE # 46-5 at 20, 22; DE # 46-4 at 51.)

Plaintiff claims that she was verbally abused by Dr. Jerry Powell, an emergency room doctor employed by Woodlawn Hospital, throughout 2016. (DE # 46-4 at 52, 55-57.) Woodlawn Hospital is one of the hospitals where defendant transports patients. (*Id.* at 48.) On December 21, 2016, plaintiff texted Galloway, complaining that Dr. Powell was verbally abusive and was creating a hostile work environment. (*Id.* at 55, 101.) Plaintiff told Galloway that she intended to file a complaint against Dr. Powell alleging that his actions created a hostile work environment based upon her sex. (DE # 58-1 at 1.) Galloway informed Unger of plaintiff's text message. (DE # 46-5 at 35-36.)

About a week after plaintiff sent the text to Galloway, plaintiff met with Galloway and Unger. (DE # 58-1 at 2.) Unger discouraged plaintiff from speaking out against Dr. Powell, saying, "these [complaints] can take months and months, and you are guilty just by breathing and being made a part of this by Dr. Powell." (*Id.* at 2.) Furthermore, at some point after plaintiff texted Galloway, Unger told plaintiff that if Woodlawn Hospital decided not to have plaintiff transport patients there, plaintiff could not continue working with defendant because Woodlawn Hospital was the main hospital to which defendant transported patients. (DE # 46-4 at 75.)

A few weeks after plaintiff texted Galloway about Dr. Powell, Galloway told plaintiff that Unger had instructed Galloway to start disciplining plaintiff and "padding" her file with disciplinary measures. (DE # 46-4 at 77-78.) Galloway told

2

plaintiff that Unger had begun auditing plaintiff's charts, had instructed Galloway to write plaintiff up, and had asked Sigerfoos to calculate plaintiff's success rate with IVs. (*Id.*) The parties dispute whether Unger instructed Singerfoos to calculate the IV success rate for any of the other employees. (DE # 46-4 at 78; DE # 58-2 at 2; DE # 63-2.) Plaintiff had a good IV success rate. (DE # 58-2 at 2.) Unger told Galloway that they had to get plaintiff out. (*Id.*) Unger also told Galloway to write plaintiff up for not washing her truck at the end of her shift, even though plaintiff had washed her truck. (*Id.*)

On March 1, 2017, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (DE # 58-1 at 2.) Plaintiff's complaint alleged sex discrimination and retaliation under Title VII against defendant, due to the treatment she received from Dr. Powell and defendant's alleged failure to take remedial action after she complained about Dr. Powell's behavior. (DE # 46-4 at 112; DE # 58-1 at 2.)

In April 2017, plaintiff was put on a Performance Improvement Plan (PIP) after plaintiff responded to a cardiac arrest on April 3, 2017. (DE # 46-4 at 37, 112.) The parties dispute whether the patient had already died before plaintiff arrived, or whether she died at the scene. (DE # 59 at 3; DE # 62 at 3.) Galloway initially reviewed plaintiff's care of the patient and rated her care as excellent. (DE # 58-2 at 2.)

A week later, Unger told Galloway that there were clinical issues with the run, and that he would be issuing plaintiff a PIP and require that she undergo remedial training. (*Id.*) The ambulance run had been reviewed by defendant's educator, Jordan

3

Foreman, and defendant's medical director, Dr. Mann. (DE # 46-10 at 1; DE # 46-5 at 63, 148.) All ambulance runs involving cardiac arrest patients were reviewed by the medical director. (DE # 46-10 at 1.) Foreman raised a number of clinical issues and concerns related to the ambulance run, and found "the lack of treatment provided to this patient to be unacceptable and by all national medical standards to be negligent." (DE # 46-5 at 149.) Dr. Mann also determined that plaintiff's treatment during the run was unacceptable, and determined that a PIP was necessary to ensure that plaintiff did not provide inappropriate care in the future. (DE # 46-10 at 1.)

Plaintiff was notified of the PIP on April 18, 2017. (DE # 46-4 at 126, 196.) According to the PIP, plaintiff responded to a patient suffering from a narcotic overdose and subsequent cardiac arrest on April 3, 2017, and: delayed providing CPR for approximately six minutes; failed to place an airway, provide ventilation, monitor ETCO2, provide oxygen, or change out CPR providers every two minutes; and terminated care prematurely. (*Id.* at 196.) Defendant informed plaintiff that she would not be able to return to work in a primary paramedic position until she successfully performed numerous scenarios with a clinical educator, and reviewed standards regarding cardiac arrest and resuscitation with the educator. (*Id.* at 196-197.) Furthermore, Dr. Mann would review all of plaintiff's clinical charts for 60 days. (*Id.* at 196.) According to defendant, the PIP was not a way of disciplining plaintiff, and she was not on a path to be fired due to this ambulance run. (DE # 46-9 at 2.)

Plaintiff disputes that she terminated care prematurely. According to plaintiff,

4

Foreman incorrectly assumed that she had called medical control to cease resuscitative efforts, when she had actually called for further direction. (DE # 58-1 at 3.) When she called, she was instructed to cease resuscitative efforts. (*Id.*)

Plaintiff participated in the retraining on April 18, 2017, with Foreman. (DE # 46-4 at 128.) Foreman, Dr. Mann, and Unger determined that plaintiff's performance during the training did not meet defendant's expectations and that another training was necessary. (DE # 46-10 at 1-2; DE # 46-11 at 1; DE # 46-9 at 2.) According to plaintiff, she was tested on scenarios that were unrelated to the concerns raised as a result of her April 3, 2017, cardiac run. (DE # 46-4 at 130; DE # 58-2 at 3.) Plaintiff believed that she was going to be tested on cardiac scenarios, and the scenario she failed was a septic scenario, not a cardiac scenario. (DE # 46-4 at 130.)

Until plaintiff could complete the additional training, plaintiff was required to work with a paramedic partner during her shift on the ambulance. (*Id.* at 197.) Plaintiff alleges that this affected her job because she was made to work the "third" position on the ambulance. (*Id.* at 130.) In that position, plaintiff was not given her own room to sleep in, even though defendant was supposed to have separate rooms for female and male EMS employees. (*Id.* at 130-131.) While all three stations that she worked out of had two separate bedrooms, each room had only one bed, and she had to sleep on a couch or a recliner. (*Id.*) The PIP and remedial training also affected plaintiff's hours at work because she could only work when there was a partner available to work with on the ambulance. (DE # 46-4 at 43, 130-131; DE # 46-6 at 3.)

5

Plaintiff attended a second remedial training with Dr. Mann and the clinical educators on May 25, 2017. (DE # 46-4 at 198.) Defendant found that, during this retraining, plaintiff "struggled with critical thinking and knowledge regarding when and why to use cardioversion in differing patient presentations," and instructed plaintiff to complete remedial review of certain protocols, to be reviewed by Dr. Mann. (*Id.*) Until such steps were completed, plaintiff would be required to work with a paramedic partner. (*Id.*)

Plaintiff was not told why she was not released from the PIP after this second retraining until a month later, on June 22, 2017. (DE # 58-1 at 5; DE # 46-4 at 198.) That day, she successfully completed the additional requirements, but was not released from the PIP for another month, until July 27, 2017. (DE # 46-4 at 198; DE # 46-5 at 72; DE # 58-1 at 5.)

Plaintiff claims that she was treated differently than the male EMT, Bill Howard, who went with her on the April 3, 2017, ambulance run. Defendant states that Bill Howard was not required to undergo a PIP because – as a non-paramedic – he was not clinically responsible for the patient's care. (DE # 46-7 at 15.) However, plaintiff has presented evidence that whenever a clinical issue arises with regard to care, both partners are counseled, regardless of whether the employee is a paramedic or an EMT. (DE # 58-2 at 3.) Howard was not given any remedial training, or counseling, regarding the care he provided on the April 3, 2017, run. (*Id.* at 4.)

On May 24, 2017, employee Chuck Blair also underwent remedial training, for a

6

cardiac run that took place on April 17, 2017. (DE # 58-2 at 4.) During Blair's cardiac run, Blair failed to contact medical control, even when he prematurely ended resuscitative efforts. (*Id.*) Blair did not follow protocol on the run, his team only completed one shock, gave only one round of cardiac drugs, and failed to administer a certain drug. (*Id.*) Blair's training was significantly shorter than plaintiff's first remedial training, and did not include non-cardiac scenarios unrelated to his April 17, 2017, cardiac run. (*Id.*) Blair was not required to undergo a second remedial training. (*Id.*)

Prior to April 2017, plaintiff had never received any disciplinary write-ups or documented verbal warnings from defendant. (DE # 46-4 at 81.) Defendant had, however, held conversations with plaintiff about her behavior or level of care. (DE # 46-5 at 42-43, 108-109.) In April or May 2016, defendant had a conversation with plaintiff about inappropriate behavior after she used an apartment in one of defendant's off-duty bases with a non-employee during off-shift hours, and had a non-employee spend the night there with her. (*Id.* at 109.) Defendant also had a conversation with plaintiff in February 2017 about plaintiff's standard of care after plaintiff delivered an unstable hypoglycemic patient to Woodlawn Hospital. (*Id.* at 35, 42-43.) In February 2017, after the incident with the hypoglycemic patient, Galloway decided to begin reviewing plaintiff's charts for educational opportunities. (*Id.* at 48, 134.)

B.   *Procedural Background*

On October 19, 2017, plaintiff filed the present action. (DE # 1.) On July 6, 2018, plaintiff filed a second amended complaint, naming defendant. (DE # 24.) Plaintiff

7

alleges two claims against defendant. In Count I, plaintiff alleges sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (*Id.* at 6.) In Count II, plaintiff alleges retaliation under Title VII. (*Id.*)

Defendant now moves for summary judgment on all of plaintiff's claims. (DE # 44.) In her response to the motion, plaintiff states that she does not intend to proceed with her claim of sex discrimination. (DE # 59 at 1.) Accordingly, the court will grant defendant's motion for summary judgment with respect to Count I of plaintiff's second amended complaint. This matter is fully briefed and is ripe for resolution.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after an adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In doing so, the non-moving party cannot rest on the pleadings alone, but must present proof in support of its position. *Id.* at 248. A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

### III.  ANALYSIS

Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e–3(a); *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018). To determine whether plaintiff's retaliation claim can survive summary judgment, the court must ultimately determine whether the evidence produced would permit a reasonable factfinder to conclude that plaintiff's sex caused the adverse employment actions she has identified. *Id.* (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, No. 18-3351, --- F.3d ---, 2021 WL 613425, at *7 (7th Cir. Feb. 17, 2021).

There are two ways a plaintiff may prove a prima facie retaliation claim. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "A plaintiff opting for the 'direct' method must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two." *Swyear*, 911 F.3d at 885.

Alternatively, a plaintiff may choose the "indirect method." *Id.* This method

9

"allows the plaintiff to establish a prima facie case without establishing a causal link." *Id.* "This method requires a plaintiff show (1) she engaged in a protected activity, (2) she performed her job duties according to her employer's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated employees who did not engage in the protected activity." *Id.* "The indirect method falls under the auspices of the *McDonnell Douglas* burden-shifting framework. Under this framework, if a plaintiff is able to establish a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the defendant offers a legitimate, non-discriminatory reason, the plaintiff must present evidence that the reasons offered by the defendant are pretextual in order to prevail on her claim. *Id.* Regardless of which method the plaintiff chooses, the court must ultimately consider the evidence as a whole to determine whether the evidence would permit a reasonable factfinder to conclude that "'plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Lewis*, 909 F.3d at 867 (quoting *Ortiz*, 834 F.3d at 764-65).

In this case, plaintiff has opted for the direct method. Defendant concedes that plaintiff engaged in protected activity. (DE # 45 at 20.) Defendant argues that it is nevertheless entitled to summary judgment because plaintiff cannot establish that she suffered an adverse action, or that there was a causal connection between any adverse action and her protected activity. (*Id.*)

"Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). Title VII's antiretaliation provision, unlike its antidiscrimination provision, is not limited to actions that affect the terms and conditions of employment. *Id.* at 174. "Rather, Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). However, the harm must be materially adverse. *Burlington*, 548 U.S. at 68. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

In this case, plaintiff has produced sufficient evidence of an adverse action to survive summary judgment. Plaintiff has identified evidence from which a reasonable jury could determine that the PIP arising from the April 3, 2017, ambulance run was not necessary, but rather was an effort to pad plaintiff's file, in order to remove her from defendant's employ. An unwarranted PIP, and its resulting impacts on plaintiff's hours and working conditions, certainly might have the power to dissuade a reasonable employee from making or supporting a charge of discrimination. Moreover, the evidence could reasonably support a finding that plaintiff's retraining was more arduous than that of a fellow paramedic who was required to undergo similar retraining. Training that was both unnecessary, and unnecessarily difficult to

11

successfully pass, might have the power to dissuade a reasonable employee from making or supporting a charge of discrimination.

Next, the court finds that plaintiff has produced evidence sufficient to support a finding of a causal connection between these adverse actions and plaintiff's protected activity. Taking the evidence in the light most favorable to plaintiff, there is sufficient evidence from which a reasonable jury could determine that plaintiff's protected activity was the reason defendant placed plaintiff on the PIP, delayed releasing her from the PIP, and imposed more onerous training requirements on her than were placed on other employees in similar situations. Based on Unger's statements to Galloway, a reasonable jury could determine that the PIP was unnecessary and was part of Unger's plan to pad plaintiff's file, to remove her from defendant's employ. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) ("In the Title VII retaliation context, causation can be established by," among other things, "a pretextual explanation for the [adverse action]."). This evidence of a pretextual explanation for the PIP would support a finding of retaliation.

Defendant argues that plaintiff relies on nothing more than suspicious timing to establish a causal connection. (DE # 62 at 12.) It is true that "'[s]uspicious timing is rarely enough to create a triable issue.'" *Igasaki*, 2021 WL 613425, at *7 (quoting *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009)). "'For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action.'" *Id.*

12

(quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)).

It is also true that in this case, suspicious timing alone would not be sufficient to support a finding of a causal connection between plaintiff's protected activity and the adverse actions. However, plaintiff does not rely exclusively on suspicious timing for evidence of a causal connection. The evidence, taken in the light most favorable to plaintiff, is that a few weeks after plaintiff's December 2016 text to Galloway stating her plan to file a sex discrimination claim against Dr. Powell, Unger directed Galloway to find ways to discipline plaintiff, in order to get her out. On March 1, 2017, plaintiff filed her EEOC complaint against defendant. A month later, plaintiff was involved in an ambulance run that her supervisor initially rated as "excellent" – only to then be placed on a PIP. Employees who had been involved in similar incidents had not been required to undergo similarly onerous retraining – or any retraining at all in Howard's case. This evidence is sufficient to create a triable question of fact on the issue of causal connection. *See Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) ("When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may 'survive summary judgment if there is other evidence that supports the inference of a causal link.'" (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005))).

## IV. CONCLUSION

For these reasons, the court **GRANTS in part** and **DENIES in part** defendant's motion for summary judgment (DE # 44), on the terms identified in this Opinion and Order. The court **ORDERS** the parties to file a joint status report regarding their

willingness to engage in a settlement conference before a Magistrate Judge by **March 19, 2021**. A trial date will be set under a separate order.

                                                  **SO ORDERED.**

Date: March 5, 2021

                                                  s/James T. Moody
                                                  JUDGE JAMES T. MOODY
                                                  UNITED STATES DISTRICT COURT